IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBERT S. WHITEHEAD,                )
                                    )
          Plaintiff,                )
                                    )
     v.                             )     CIVIL ACTION NO. 2:07CV589-SRW
                                    )              (WO)
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
          Defendant.                )

**MEMORANDUM OF OPINION**

On January 17, 2006, plaintiff Robert S. Whitehead filed an application for disability

insurance benefits and supplemental security income payments, alleging disability since

October 9, 2005.   On October 19, 2006, after the claim was denied at the initial

administrative levels, an ALJ conducted an administrative hearing.  The ALJ rendered a

decision on December 8, 2006.  The ALJ concluded that plaintiff suffered from the severe

impairments of "status-post compression fracture L3, complex partial seizures (petite mal

epilepsy), and hypertension[.]"  (R. 34).  He found that plaintiff's impairments, considered

in combination, do not meet or equal the severity of any of the impairments in the "listings"

and, further, that while plaintiff cannot perform his past relevant work, he retains the residual

functional capacity to perform jobs existing in significant numbers in the national economy.

Thus, the ALJ concluded that the plaintiff is not disabled within the meaning of the Social

Security Act.  On April 27, 2007, the Appeals Council denied plaintiff's request for review.

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of the Commissioner's decision.  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## BACKGROUND

Plaintiff was born on January 21, 1974 and was thirty-two years old on the date of the

ALJ's decision. (R. 380). Plaintiff graduated from high school in 1992 and completed vocational training in air conditioning and refrigeration in 1992 and truck driving school in 1994. (R. 100). He has past relevant work as a cook, floor cleaner, poultry worker and truck driver. (R. 103-115). Plaintiff worked the longest as a truck driver, from 1995 until 2004. (R. 96).

In a visit to his primary care physician on September 17, 2001, plaintiff complained of "dizzy spells [at] times." (R. 354). On August 5, 2003, plaintiff reported to his primary care physician that he had passed out behind the wheel of an 18-wheeler, and that he had experienced dizziness on and off over six months. He also reported pain in his jaw area for six months. (R. 325). In early September 2003, plaintiff was evaluated by Dr. Wouters, a neurologist, for his complaints of dizzy spells and blacking out. Dr. Wouters' initial impression was vertigo, with the possibility of Meniere's disease. (R. 230-33). Plaintiff reported three weeks later that the dizziness had gone away (R. 229) and, in January 2004, that he "has had a couple of small spells of dizziness, but nothing too major." (R. 228). At that time, Dr. Wouters concluded that no treatment was necessary, and planned to see plaintiff in one year, or sooner if the spells became worse. (Id.).

Plaintiff returned to Dr. Wouters fifteen months later, on May 4, 2005, because of new spells. Dr. Wouters noted:

> These are evidently 2 witnessed spells where he gets kind of confused. He will sit there and kind of stare at the wall and have some lip smacking movement. this will last a few minutes. Afterwards, he is a little sleepy, but he does come to himself pretty good. He has had a few spells where he swallowed his gum, so he has had probably more than just two.

(R. 226). Dr. Wouters diagnosed "[c]omplex partial seizures" and "[d]izziness that is felt i[s] due to a very mild case of Meniere's disease." (R. 225). Dr. Wouters prescribed Dilantin and ordered an EEG. (Id.). On May 18, 2005, Dr. Wouters noted that plaintiff was doing "much better with the Dilantin" and had experienced no more spells. His assessment was again that plaintiff suffered from complex partial seizures. He continued plaintiff on Dilantin. (R. 223). On August 22, 2005, plaintiff complained to Dr. Wouters of numbness and tingling in his hand. Dr. Wouters noted:

> He [] complains of like a little numbness and tingling in his hand. This is kind of 2 different spells. One spell, it looked like it was seizures. His seizures are that he will grab his hand and then kind of stare off in space and then be sleeping a few hours afterwards. Some of the numbness that he has is just 10 seconds to a few mins. where his hand just gets intensely numb all of a sudden.

(R. 221). After plaintiff's EMG showed signs "compatible with a minimal right carpal tunnel syndrome," Dr. Wouters diagnosed "[c]omplex partial seizures with secondary generalization" and "[m]inimal carpal tunnel syndrome." He increased plaintiff's Dilantin dosage and prescribed a wrist brace. (Id.).

On October 9, 2005, plaintiff was admitted to Flowers Hospital after he was involved in a motor vehicle accident. He apparently had a seizure while he was driving and ran through a stop sign and into a ditch. He suffered a compression fracture at L-3 and also broke his nose. He was discharged on October 12, 2005. (R. 158-175, 270-85).

Plaintiff returned to Dr. Wouters on October 24, 2005. Dr. Wouters checked plaintiff's Dilantin levels. (R. 218). In plaintiff's follow-up visit one month later, on November 22, 2005, Dr. Wouters noted that plaintiff "has had one more seizure since I saw him last." He added a prescription for Depakote. (R. 216).

Plaintiff was treated by Dr. Woodham, a neurosurgeon, for his L3 compression fracture. Dr. Woodham prescribed a back brace and, on October 31, 2005, advised plaintiff to wean himself off of the brace over the next three weeks. (R. 305). In a follow up visit on November 29, 2005, plaintiff reported "low back pain, nothing of significance," and told Dr. Woodham that he felt he could go back to work. Dr. Woodham noted, "He has no neurologic complaints and no neurologic deficits today." (R. 304). On January 12, 2006, Dr.Woodham recorded that plaintiff "has a 50 plus percent compression fracture but he does not have any symptomatology of canal compromise. He has minimal pain when he stands." Dr. Woodham predicted that plaintiff would reach maximum medical improvement in four months, and he imposed a permanent weight lifting restriction of fifty pounds. (R. 303).

On January 4, 2006, plaintiff reported to Dr. Wouters that he had experienced three seizures since the last visit. Dr. Wouters noted,

> I am going to obtain a level today. My plan is to increase theDepakote until we get an adequate drug level. If that doesn't control him, we will add a third medication. If that fails to control him, we will probably get him set up for evaluation at UAB and see what they think about him.

(R. 214).

Plaintiff complained of dizziness to his primary care physician in office visits on February 2 and February 15, 2006. (R. 316, 317). In May 2006, plaintiff sought treatment from the Neurological Care Center of Montgomery. Dr. Rosa Bell's treatment notes for the first visit state:

> 31 y.o. RH male who presents with seizures x 4 years. Seizures are described by observers as staring episodes. At one time had aura of dizzy spells, currently no warning. Never had GTC. States that observers also have told

5

him that he moves his right hand with events.  Never episodes of urinary incontinence, never to[]ngue bi[]ting.

(R. 359).  Dr. Bell ordered a brain MRI, prescribed Ativan and continued plaintiff on Dilantin. Dr. Willie Glover saw plaintiff in a follow-up visit on June 12, 2006.  He reported that the MRI was normal.  Plaintiff reported that his last known seizure was May 11th, that his seizure frequency was two to three times per month, and that he had a "funny feeling" like he was going to have a seizure on June 10th, but he was "unsure if he had an actual seizure because no one was around and he is not aware once a seizure occurs." (R. 357).  Dr. Glover's note for an August 8, 2006 office visit states,

> The pt states he has had two seizures since he was last seen in this office 2 months ago.  The seizures were witnessed by family members and occurred on July 31st and August 5th.  Both seizures primarily consisted [of] staring episodes.

(R. 365).  Dr. Glover continued plaintiff on Dilantin and directed him to take Ativan for the next three days.  (R. 365-66).  On September 19, 2006, plaintiff reported that he had experienced six seizures since the previous visit.  Dr. Glover noted,

> He states he may have had one today.  All episodes are such he would have an unusual feeling that he was suddenly not aware of what happened for a few seconds (>30 seconds) with no related movements.  Two episodes witnessed by family demonstrated blank stare only.

(R. 363).  He continued plaintiff on Dilantin, and stated, "I will implement Ativan 0.5 bid for next two weeks to assess if pt has any seizure activity while on this medication – if not may implement Klonopin as second agent[.]" (Id.).

At the administrative hearing, plaintiff testified that he has back pain at a level of six on a scale of ten for about the first hour and a half after he gets out of bed in the morning.

6

After that, his back still hurts, but at a mild level of two on a scale of ten. Plaintiff stated that

Dr. Woodham told him to take aspirin or Tylenol if he had mild pain. (R. 388-90). He

testified that after he stands for about 35 minutes, his back starts hurting. Plaintiff testified

that if he could stand up about every twenty minutes, he could sit for six or seven hours in

an eight-hour day, that he could stand a total of two or three hours, and could walk for two

hours. (R. 391-92). Plaintiff testified that he is a full-time student at Troy University, and

that he is in school from after breakfast until 3:00 p.m. (R. 381-82, 392-93). Plaintiff

described his seizures as follows:

> Q. Describe one of your seizures for me.
>
> A. Well, for me it's just a little dizzy spell and then everything disappears to
> me, that's about the only way I can describe it. Or in other words you can say
> like if you took the TV remote control and you turned it off and turned it right
> back on, that little spell between that time, that's what it looks like to me. It's
> like the world just totally disappears.
>
> Q. For how long?
>
> A. I have been told its been 20 – 10 to 20, 30 seconds.
>
> Q. And how often does this occur?
>
> A. Well, sometimes it might not, it might not happen for a month or two and
> then it might go on – like here lately I have – this month, I already had four
> this month. But it has no set time limit at all.

(R. 395). Plaintiff's father testified as follows:

> Q. Mr. Whitehead, have you had an occasion to witness Robert Whitehead
> have a seizure?
>
> A. I have.
>
> Q. Can you tell us what you saw?

7

A.  He, he just goes into a state of, just, just looking out into space and you can't, you can shake him, you can slap him, you can holler at him, you can't, you can't get him to respond whatsoever for maybe 15 to 20 seconds or something or –

Q.  When was the last time you observed this?

A.  A couple of days ago he had in, in the living room with me and he, he was sitting on the couch and had a cup of coffee in his hand and he dropped the cup of coffee.  But, but he just sit there and I have to talk to him and he wouldn't, he wouldn't say anything back to me.  So, that's, that's the way I tell when he, when he has one.

Q.  How many of these do you estimate you've seen the last few months?

A.  Oh, eight or 10 I'm pretty sure.

ALJ: In what period of time?

* * * * *

A.  The last, last three months.

* * * * *

Q. . . . So how many have you witnessed in the last year, of the seizures?

A.  Oh, I, I don't know, there's been, been a lot of them.

Q.  More th[a]n, more th[a]n 50?

A.  I'm pretty sure.

(R. 397-99).  Dr. Jack Evans testified as a medical expert that plaintiff suffers from "status post compression fracture, L3," hypertension, and "complex partial seizures or pet[it] mal, epilepsy."  (R. 400-401).  Dr. Evans testified that "[t]he complex partial seizure is [Listing] 11.03, to meet that listing he has to, as you know have one seizure a week on an average." (R. 401). Based on the seizure history provided by plaintiff (see history and calendar, R. 154-

8

56), Dr. Evans testified that plaintiff did not meet Listing 11.03.  Dr. Evans further testified

that plaintiff would be able to sit for one hour at a time for a total of eight hours in an eight

hour day; stand for thirty minutes at a time for a total of four hours; walk thirty minutes at

a time for a total of two hours; occasionally lift or carry fifty pounds; frequently lift or carry

twenty pounds; frequently use his hands for simple grasping and fine manipulation;

frequently push and pull arm controls; occasionally push and pull leg controls; occasionally

stoop, crawl, or be exposed to marked changes in temperature and humidity; frequently

crouch, kneel, or reach overhead, and never climb, balance, work around unprotected heights

or moving machinery, or operate motor vehicle equipment.  (R. 403-04).

> In his decision, the ALJ concluded that:
>
> Claimant retains the residual functional capacity to meet the exertional
> demands of a reduced range of medium work, in that he can occasionally
> lift/carry 40 pounds and frequently lift/carry 20 pounds if allowed a sit/stand
> option.  Claimant has the following nonexertional limitations: frequently use
> hands for simple grasping, pushing/pulling of arm controls, and fine
> manipulation; occasionally use legs for pushing/pulling of leg controls;
> occasionally stoop and crawl; never climb or balance; frequently crouch, kneel
> and reach overhead; never work around unprotected heights, moving
> machinery, or operate motor vehicle equipment; occasionally do work that
> requires exposure to marked changes in temperature and humidity. Claimant[]
> experiences a mild amount of pain during the day.  He must never work around
> any hazardous heights or hazardous objects due to occasional petit[] mal
> seizures, staring spells, during which he loses concentration.

(R. 32-33).  The ALJ found that plaintiff is unable to perform his past relevant work but,

based on the testimony of a vocational expert, that he retains the residual functional capacity

to perform jobs existing in significant numbers in the national economy, including jobs as

an assembler, hand packer, and machine tender for automatic machines.  (R. 33).

9

**DISCUSSION**

The plaintiff challenges the Commissioner's decision, arguing that: (1) the ALJ failed to develop the record properly because he did not have a neurologist testify at the hearing, and  Dr. Evans ("a retired internist who referred all his patients who had seizures to a neurologist when he was in practice") possibly did not use the correct listing (plaintiff's brief, p. 7); and (2) the ALJ failed to consider plaintiff's impairments in combination.

Plaintiff argues that he would meet Listing 11.02 "if his seizures were in fact tonic clonic or grand mal seizures whereas the frequency of seizures would not equal the requirements of Listing 11.03." (Plaintiff's brief, p. 7).  Listing 11.02 applies to "Epilepsy – convulsive epilepsy (grand mal or psychomotor)," while Listing 11.03 – the listing expressly evaluated by Dr. Evans – pertains to "Epilepsy – nonconvulsive epilepsy (petit mal, psychomotor, or focal)."   The record contains no evidence that plaintiff suffers from convulsive epilepsy.  His treating physician's notes repeatedly indicate that he has "[n]ever had GTC [generalized tonic-clonic]," no tongue biting, and no urinary incontinence.  (See Exhibits 10F, 11F).  Neither plaintiff nor his father testified that plaintiff suffers from convulsions when he has a seizure.  Plaintiff points to no diagnosis of convulsive or "grand mal" epilepsy by his treating neurologists and no anecdotal evidence suggesting that he suffers from convulsive epilepsy.  The record was sufficient to permit the conclusion that plaintiff's seizure disorder did not constitute convulsive epilepsy, and the ALJ did not commit error by failing to seek testimony from a neurologist at the hearing.  Cf. Ingram v. Commissioner of Social Security Administration, 496 F.3d 1253, 1269 (11th Cir. 2007)("The

administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision.").

Additionally, the ALJ expressly stated that he considered the plaintiff's impairments "individually and in combination." (R. 34, Finding No. 4). An evaluation of the ALJ's finding regarding plaintiff's residual functional capacity likewise reveals that the ALJ considered the effects of plaintiff's impairments in combination. (See id., Finding No. 6). Plaintiff's argument that the ALJ failed to consider his impairments in combination is without merit. See Douglas ex rel. Patterson v. Commissioner of Social Security, 2005 WL 3116634 (11th Cir. Nov. 23, 2005)("During the sequential evaluation, the ALJ considered Patterson's impairments in combination when he was assessing whether Patterson met, equaled, or functionally equaled a listed impairment. Specifically, the ALJ stated, 'claimant's combination of impairments does not meet or medically equal the criterial set forth for any impairment in the listings.' It is clear from the ALJ's statements that he considered Patterson's impairments in combination.")(citing Wheeler v. Heckler, 784 F.2d 1073, 1076 (11th Cir. 1986)); Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002)(ALJ's step two finding that claimant did not have "an impairment or combination of impairments" that met or equaled a listing evidenced ALJ's consideration of the combined effect of the claimant's impairments)(citing Jones v. Department of Health and Human Services, 941 F.2d 1529, 1533 (11th Cir. 1991)).

**CONCLUSION**

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and correct application of the law and, accordingly, that it is due to be affirmed.  A separate judgment will be entered.

DONE, this 28th day of August, 2008.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.      **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by
statute:

(a)      **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and
judgments of district courts, or final orders of bankruptcy courts which have been
appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are
appealable. A final decision is one that "ends the litigation on the merits and leaves
nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre,
701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and
recommendation is not final and appealable until judgment thereon is entered by a
district court judge. 28 U.S.C. § 636(c).

(b)      **In cases involving multiple parties or multiple claims,** a judgment as to fewer than
all parties or all claims is not a final, appealable decision unless the district court has
certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v.
Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all
issues except matters, such as attorneys' fees and costs, that are collateral to the
merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486
U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v.
Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

(c)      **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders
"granting, continuing, modifying, refusing or dissolving injunctions or refusing to
dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . .
determining the rights and liabilities of parties to admiralty cases in which appeals
from final decrees are allowed." Interlocutory appeals from orders denying temporary
restraining orders are not permitted.

(d)      **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification
specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to
appeal is filed in the Court of Appeals. The district court's denial of a motion for
certification is not itself appealable.

(e)      **Appeals pursuant to judicially created exceptions to the finality rule:** Limited
exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial
Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949);
Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d
371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157,
85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

Rev.: 4/04

2.    **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. <u>Rinaldo v. Corbett</u>, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)    **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)    **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)    **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)    **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

(e)    **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. <u>See</u> <u>also</u> Fed.R.App.P. 3(c). A <u>pro</u> <u>se</u> notice of appeal must be signed by the appellant.

4.    **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).